1   Christopher Mixson (NV Bar #10685)
    KEMP JONES, LLP
2   3800 Howard Hughes Parkway, Suite 1700
    Las Vegas, Nevada 89169
3   702-385-6000
    c.mixson@kempjones.com
4
    Rafe Petersen (D.C. Bar #465542) (*pro hac vice to be requested*)
5   Alexandra E. Ward (D.C. Bar #1687003) (*pro hac vice to be requested*)
    HOLLAND & KNIGHT LLP
6   800 17th Street N.W., Suite 1100
    Washington, DC  20006
7   Telephone: 202.419.2481
    Fax: 202.955.5564
8   rafe.petersen@hklaw.com
    alexandra.ward@hklaw.com
9
    *Attorneys for Plaintiffs*
10
                    **UNITED STATES DISTRICT COURT**
11                     **DISTRICT OF NEVADA**

12   _____
                                              )
13   The BURNING MAN PROJECT, FRIENDS OF      )
     BLACK ROCK/HIGH ROCK, INC., FRIENDS OF   )
14   NEVADA WILDERNESS, DAVID JAMIESON,       )
     and ANDY MOORE, as individuals,          )
15                                            )
              Plaintiffs,                     )
16                                            )
          v.                                  )        Case Number: 3:23-cv-13
17   The UNITED STATES DEPARTMENT OF THE      )
     INTERIOR, BUREAU OF LAND                 )        **COMPLAINT FOR DECLARATORY**
18   MANAGEMENT, BLACK ROCK FIELD OFFICE,     )        **AND INJUNCTIVE RELIEF**
     MARK HALL in his official capacity as Field )
19   Manager of the Black Rock Field Office of the )
     Bureau of Land Management, and DEBRA     )
20   HAALAND in her official capacity as Secretary of )
     the Interior,                            )
21                                            )
              Defendants.                     )
22   _____)

23
24          Plaintiffs the Burning Man Project, Friends of Black Rock/High Rock, Inc., Friends of

25   Nevada Wilderness, David Jamieson, and Andy Moore, by and through their attorneys of record,

26   hereby complain and allege as follows:

27

28

# INTRODUCTION

1.      Plaintiffs challenge Defendants' failure to comply with the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Administrative Procedure Act ("APA"), in issuing a Final Environmental Assessment[1], Finding of No Significant Impact, and Decision Record approving the Gerlach Geothermal Exploration Project ("Exploration Project").

2.      The Exploration Project is a proposed geothermal resource confirmation drilling project Operations Plan ("OP") approved under 43 C.F.R. § 3261.12 for Ormat Nevada Inc., LLC ("Ormat").  The approved action would allow Ormat to construct and maintain a geothermal resource confirmation project in the Gerlach Geothermal Unit, which includes various leases held by Ormat. The leased area totals 5,704 acres of Bureau of Land Management ("BLM")-administered public lands and private lands surrounding the town of Gerlach in Washoe County, Nevada.

3.      The Exploration Project includes construction of 19 geothermal resource confirmation drilling wells and well pads, approximately 2.8 miles of improved and new access roads, and associated facilities.  The Exploration Project, however, is only the first portion of a much larger proposed geothermal *development* project, which Defendants failed and refused to consider in approving the Exploration Project.

4.      Defendants' environmental review of this Exploration Project under NEPA ignored multiple potential harms related to the approved OP activities and the future but inevitable large scale geothermal production project.  Foremost, the proposed wells are located directly adjacent to a number of inimitable hot springs and will utilize the same geothermal fluid that heats the springs. These hot springs are unique environmental resources that are relied upon by the local community for tourism, and as a fundamental water source in an area that otherwise does not have water abundance. The hot springs are also ecologically important because they are interconnected with each other, the ecosystem, and the pristine landscape of the region.  The Exploration Project and

---

[1] *See* Environmental Assessment, Gerlach Geothermal Exploration Project (DOI-BLM-NV-W030-2022-0001-EA) August 2022.

1   subsequent development of a large scale geothermal energy project threatens the continued
2   existence of the hot springs and their use and enjoyment by Plaintiffs.

3        5.     Ormat has attempted to evade analysis of such impacts by segmenting the Project to
4   limit BLM's review to only the first stage of its plans, i.e. the exploration stage.  However, this first
5   stage merely confirms where the resources are located to inform future industrial scale geothermal
6   energy development. Granting the right to confirm the location of geothermal resources in this area
7   via exploration drilling means that an industrial scale geothermal power plant and power lines are
8   inevitable, and once the confirmatory Exploration Project begins, it will be impossible to stop the
9   effects of the entire geothermal production project. Indeed, the EA concedes that there is the
10  potential for a time lag between detectable and maximum effects in surface expression of the
11  geothermal resource. EA at 3-41. Hence, "monitoring and mitigation measures would minimize, but
12  could not completely avoid, long-term effects on the water quantity and quality." *Id*.

13       6.     Ormat seeks to develop an industrial scale geothermal plant less than one-half mile
14  from a community and adjacent to nationally important resources, including but not limited to the
15  Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area (the "Black
16  Rock NCA"), the Fox Range and Selenite Mountains Wilderness Study Areas, and the proposed
17  Granite Banjo Wilderness Area.  Ormat's Exploration Project will lay the foundation for turning a
18  unique, virtually pristine ecosystem of environmental, historical, and cultural significance into an
19  industrial zone, and permanently alter the landscape.  This will directly impact Plaintiffs' property
20  interests as well as their members' use and enjoyment of the area.

21       7.     In sum, the NEPA review for Ormat's Exploration Project was inadequate because,
22  among other things, it impermissibly segmented the exploration activities from the reasonably
23  foreseeable geothermal plant development and operation, failed to take a hard look at Exploration
24  Project alternatives, failed to meaningfully consider cumulative impacts of the Exploration Project,
25  and does not require Ormat to comply with any robust mitigation measures to ensure these
26  ecological, historical, and cultural resources are not permanently altered or destroyed.

27       8.     BLM's ultimate conclusion that more detailed NEPA review is not warranted is
28  based on a mitigation plan that has yet to be fully developed. Without robust mitigation requirements

in place or meaningful consideration of Project alternatives, impacts, and connected actions as required under NEPA, the Project could permanently degrade the hot springs and therefore permanently impact a valuable resource for the local community, the ecosystem, and the pristine landscape of the area. At a minimum, a full Environmental Impact Statement should have been prepared, as opposed to merely an Environmental Assessment.  The approval of the Project is also inconsistent with the Resource Management Plan for the Black Rock NCA.

9.      For these reasons, as described below, Plaintiffs hereby seek a declaration that Defendants violated NEPA and FLPMA in issuing and approving a Final Environmental Assessment, Finding of No Significant Impacts, and Decision Record and Authorized Operations Plan for the Project on October 21, 2022 (collectively, the "NEPA Decision Documents")[2] and that the NEPA Decision Documents were arbitrary and capricious under the APA.  Plaintiffs request vacatur of the NEPA Decision Documents, as well as preliminary and permanent injunctive relief to enjoin any implementation of the Operations Plan.

## JURISDICTION AND VENUE

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the National Environmental Policy Act, 16 U.S.C. §§ 4321 *et seq.*, FLPMA, 43 U.S.C. §§ *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

11.      An actual, justiciable controversy exists between Plaintiffs and Defendants, and the challenged agency actions are final and subject to this Court's review. The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Defendants maintain offices in this judicial district, a substantial part of the events or omissions giving rise to these claims occurred in this judicial district, and the lands involved in this case are located in this judicial district. Venue also is proper in the unofficial Northern Division of this District because the action arose in Washoe and Pershing Counties. LR 1-6, 1-8.

---

[2] All NEPA Decision Documents are available on BLM's eplanning website for the Ormat Project.

# PARTIES

13. Plaintiff BURNING MAN PROJECT ("BMP") is a California nonprofit public benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code, and headquartered in San Francisco, California. Burning Man Project and its predecessors[3] have held the Burning Man Event on public lands since 1993, and is therefore the annual Special Recreation Permit ("SRP") permittee for the Burning Man Events. Burning Man Project retains no profits, and all earnings are dedicated to furthering its charitable activities.

14. BMP and its predecessors, are now, and have been at all relevant times since 1993, permittees of Department-administered public lands located within the Black Rock NCA, for the purposes of conducting the iconic annual Burning Man Event.  BMP was instrumental in the creation of the Black Rock NCA which includes an express provision that large-scale, permitted recreational activities, such as the Burning Man Event, are expected to continue on the site.  The Event was specifically made a part of the Resource Management Plan for the Black Rock NCA.

15. The Burning Man Event currently attracts more than 70,000 individuals who, over the course of eight days, camp and participate in a unique experimental community on the Black Rock NCA.  The ethos and culture of the Event are rooted in the Ten Principles of Burning Man: Radical Inclusion, Gifting, Decommodification, Radical Self-reliance, Radical Self-expression, Communal Effort, Civic Responsibility, Leaving No Trace, Participation, and Immediacy. These concepts are central to the participants' experience at Burning Man, and they are also reflected in the Event's commitment to and record of health, safety, and environmental compliance.  Consistent with Burning Man's Ten Principles, BLM has developed and refined a "Leave No Trace" standard for the Event.

16. Moreover, economic development of the community of Gerlach has blossomed, in large part due to significant investments by BMP.  This economic development includes BMP's purchase and development of several commercial properties in Gerlach, an RV campground, and a

---

[3] Prior to 2019, an affiliated organization, known as Black Rock City, LLC, was listed as the SRP permittee for the Burning Man Event. Burning Man Project assumed full responsibility as the SRP permittee for the Burning Man Events in 2019.

vintage hotel, as well as the numerous proposals by local stakeholders for recreational and art trails throughout the community, including within the Proposed Area of Interest ("AOI") described in the NEPA Decision Documents. People travel to Gerlach to experience the solitude of the vast open spaces and undeveloped vistas present in the Black Rock Desert, as well as to attend numerous events and to pursue a variety of recreation experiences in the undeveloped desert.  The Exploration Project and the inevitable large scale geothermal production project threatens the viability of such experiences, and the investments made in them by BMP (including the Burning Man Event), by industrializing a portion of the Black Rock NCA with the introduction of noise, traffic, light, and presence of the drilling infrastructure, all of which are wholly inconsistent with BMP's and others use and enjoyment of the area.

17.     BMP also owns real property in Gerlach known as "the 360 Property", which straddles State Route 34. This 360-acre parcel of land is being developed by BMP into a space for artists, theme camp organizers, and mutant vehicle owners, plus storage space for containers and potential green energy use.  The 360 Property is important to BMP's future plans and will also boost the local economy through tourism revenue.

18.     The Proposed AOI surrounds the 360 Property and includes hot springs that BMP is in the process of developing for safe and responsible recreational use.  BLM's approved action would allow for the drilling of well pads that abut the 360 Property to the north, and lie closely to the south, both of which are in close proximity to the Ditch Spring and other natural hot springs that fall within this private property.  BMP has expressed concerns of severe, and possibly permanent, adverse impacts to springs caused by the Exploration Project and inevitable subsequent geothermal plant development and operations.

19.     Plaintiff FRIENDS OF BLACK ROCK/HIGH ROCK, INC. ("Friends of Black Rock/High Rock") is a Nevada nonprofit public benefit corporation, recognized as exempt under section 501(c)(3) of the Internal Revenue Code, that was formed in 1999 in support of various groups of people who came together with the common goal of preserving the region and promoting appreciation for its historical, ecological, agricultural, recreational and scenic resources.  Friends of Black Rock/High Rock consists of neighbors, visitors, and concerned citizens who share a

commitment to the wild, remote, and priceless Black Rock NCA, created by the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area Act of 2000, which early members of Friends of Black Rock/High Rock helped advocate for.

20.     Friends of Black Rock/High Rock have a local office in Gerlach, Nevada to help support and promote tourism within the Black Rock NCA. Gerlach, with just under 200 residents, is the closest town and is considered to be the gateway to the Black Rock NCA.

21.     Members of Friends of Black Rock/High Rock frequently recreate in and around the lands of the Black Rock NCA and provide critical support, volunteers and expertise to the BLM in management of the Black Rock NCA.  Projects undertaken by Friends of Black Rock/High Rock include education and outreach, youth stewardship programming, field expeditions, invasive species mitigation, spring assessments, drought and wildlife monitoring, site clean-ups, and trail work.

22.     Congress created the Black Rock NCA specifically to protect 180 miles of historic emigrant trails used by pioneers to travel from the Eastern States to Oregon and California in the mid-1800s. Also protected is the surrounding landscape of rugged mountains and high desert that is largely unchanged since those early days of national expansion. Recreation, hunting, trapping, livestock grazing, commercial events, activities requiring special permits, and previously existing, valid mining, all continue in the Black Rock NCA.  Education and stewardship of the Black Rock NCA are the core tenets of Friends of Black Rock/High Rock's work.

23.     Friends of Black Rock/High Rock recently applied for financial assistance from the National Parks Service, Rivers, Trails and Conservation Assistance Program ("RTCA"). This grant would assist with priority projects and strategic planning, such as historic walking tours and interpretative guidance.  Friends of Black Rock/High Rock already have several grants that are being used for a new interpretive guide program to provide additional recreational opportunities, which is consistent with the State of Nevada's strategic priority of promoting and developing statewide tourism.  Friends of Black Rock/High Rock bring this suit on behalf of itself and its members in order to ensure protection of these unique natural resources from which they derive aesthetic, recreational, and spiritual benefits.

24.     Plaintiff FRIENDS OF NEVADA WILDERNESS is a Nevada nonprofit public benefit corporation, recognized as exempt under section 501(c)(3) of the Internal Revenue Code, dedicated to preserving all qualified Nevada public lands as wilderness, protecting all present and potential wilderness from ongoing threats, educating the public about the values of and need for wilderness, and improving the management and restoration of wild lands. Friends of Nevada Wilderness and its members regularly volunteer in and enjoy Nevada's wilderness areas, while also helping to monitor and restore these special wild places. To further protect our wild places, Friends of Nevada Wilderness reviews agency land use plans, travel management plans, and other proposals that could affect wilderness and also conducts on-the-ground inventories to determine remaining wild areas on Nevada's public lands that may have wilderness characteristics.

25.     Friends of Nevada Wilderness has been working on protecting the Black Rock Desert region for many decades and was instrumental in the legislation that created the Black Rock NCA and the Wilderness areas within it.  Many of their supporters and volunteers recreate in and around Gerlach. Friends of Nevada Wilderness brings this suit on behalf of itself and its members who derive direct benefits from the Black Rock NCA and also support and partner with BLM for its protection.

26.     Plaintiff ANDY MOORE is a resident of the town of Gerlach in Washoe County, Nevada, which is the proposed location of the Exploration Project and the inevitable industrial scale geothermal production project. Mr. Moore frequently visits the Black Rock NCA and local hot springs and recreates in the area where the Exploration Project is proposed. Mr. Moore is also a member of the Gerlach/Empire Citizen Advisory Board, which is an elected board that advises the Washoe County Board of County Commissioners on issues of relevance to Gerlach/Empire citizens.

27.     Plaintiff  DAVID JAMIESON owns real property known as the Great Boiling Springs in Gerlach, Nevada and has valid state-issued water rights to the underground water resources located therein.

28.     The Great Boiling Springs are a unique network of natural pools and mud volcanoes with water that ranges in temperature from about 95 degrees Fahrenheit to 207 degrees. The Great Boiling Springs was first described by white explorers in 1844 when explorer John C. Fremont

1    passed through the region shortly before arriving at Pyramid Lake. The water in the springs is

2    thousands of years old and has microbes that are likely found nowhere else.  There are not many

3    other examples of such fossilized water in such pristine condition anywhere else in the United States.

4    The Great Boiling Springs is recognized in the EA as a prehistorically important spring eligible for

5    listing on the National Register of Historic Places under criterion A.

6           29.    Since 2004, University of Nevada, Las Vegas researchers have visited and studied

7    the Great Boiling Springs for microbes that could help unlock the secrets of the origin of life.  To

8    date, NASA has issued more than $900,000 in grants to fund this research. Multiple other

9    researchers have visited the Great Boiling Springs due to their uniqueness and pristine water quality.

10          30.    One of the proposed wells of the Exploration Project is adjacent to the Great Boiling

11   Springs property.  The noise, traffic, light, and presence of the drilling infrastructure directly impacts

12   Mr. Jamieson's property interests.  In turn, any changes to the volume, temperature or chemistry of

13   the water due to Ormat's activities would forever change the Great Boiling Springs, thereby harming

14   Mr. Jamieson.  No amount of artificial mitigation could replace these natural conditions.

15          31.    Defendants' violations of law, including NEPA, FLPMA, and the APA cause

16   procedural and substantive harm to Plaintiffs and their members. Overall, construction and operation

17   of the Exploration Project and the inevitable industrial scale geothermal production project would

18   harm the Plaintiffs and their members' property interests, and interests in enjoyment of the Black

19   Rock NCA and surroundings by changing a nearly pristine desert environment into an industrial

20   setting with substantial noise, traffic and light from round-the-clock drilling. The proposed

21   infrastructure, noise, traffic, and light will have a permanent impact on the surrounding ecosystem

22   and landscape. Moreover, drilling of the exploratory wells threatens to negatively impact Plaintiffs'

23   interests by altering various springs' water quantity, flow, temperature, and overall quality. Future

24   exploitation of the geothermal resources is inevitable following Ormat's confirmation of the location

25   of the geothermal resources in this area via the Exploration Project, and indeed will likely utilize

26   the same well pads created by Ormat in the exploration phase, but the extent of the negative impacts

27   from such exploitation is unknown because of BLM's failure to comply with NEPA, FLPMA and

28   the APA.

32.     These are actual and concrete injuries that the BLM has been made aware of during the various scoping and public comment periods related to this Exploration Project. BLM has ignored such comments, which is itself a procedural violation of NEPA.  The relief sought is necessary to redress these injuries.

33.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Department") is a federal executive department of the United States government charged by law with administering public lands, including the public lands involved in this case.

34.     Defendant DEBRA HAALAND ("Secretary") is the Secretary of the United States Department of the Interior and is sued in her official capacity.

35.     Defendant BUREAU OF LAND MANAGEMENT ("BLM") is the administrative body to which the Department has delegated management of these public lands.  The challenged approvals were issued by the Winnemucca District, Black Rock Field Office of the BLM.

36.     Defendant MARK HALL is the Field Manager of the Black Rock Field Office of the Winnemucca District of the BLM, and was the Authorized Officer for the challenged NEPA Decision documents, and is sued in his official capacity.

## LEGAL FRAMEWORK

### The National Environmental Policy Act

37.     NEPA, 16 U.S.C. §§ 4321 *et seq.*, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It serves twin goals. First, it aims to ensure that federal agencies carefully consider detailed information regarding the environmental impact of a proposed action before reaching a decision on the action. Second, it ensures that information about a proposal's environmental impact is made available to members of the public so that they may play a role in the decision-making process. NEPA ensures that important effects will not be overlooked or underestimated, only to be discovered after resources have been committed or the die otherwise cast.

38.     Under NEPA, federal agencies must take a hard look at the environmental impacts of a proposed agency action through analysis and disclosure of the effects of the proposed action and its alternatives.

39.     The Council on Environmental Quality within the Executive Office of the President ("CEQ") is responsible for promulgating regulations to assist federal agencies in implementing NEPA, 40 C.F.R. Part 1500 *et seq.*  According to the Draft EA, NEPA review of the Exploration Project was performed in accordance with the CEQ revised regulations effective September 14, 2020, and BLM regulations for implementing NEPA.  However, the Final EA itself cites to the pre-2000 regulations at various times.

40.     Federal agencies may also promulgate their own NEPA regulations and issue agency-specific NEPA guidance. The Department of Interior has promulgated NEPA regulations, 43 C.F.R. Part 46, and has issued a number of Department Manuals ("DMs") to facilitate NEPA implementation, including DMs 1, 2, and 3, which cover general NEPA compliance, expectations, and management of the NEPA process by Department administrative bodies such as BLM, and DM 11, which specifically pertains to BLM's NEPA implementation.[4]

41.     Furthermore, BLM has a NEPA Handbook, H-1790-1, dated January 2008 ("NEPA Handbook"), which provides detailed guidance for BLM's review of agency actions under NEPA.[5]

42.     NEPA review is conducted through preparation of an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS"), depending on the likelihood of significant effects due to the proposed action. An EA is appropriate if it is not likely that a proposed action will have significant effects. Otherwise, an EIS must be prepared to satisfy NEPA requirements. 40 C.F.R. § 1501.3(a); 516 DM 11.7(E), 11.8.

43.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4. A federal agency action may be "significant," depending on the potentially affected environment and degree of the effects of the action. 40 C.F.R. § 1501.3(b).  "Significance varies

---

[4] The Department Manuals are available on the Department of the Interior's webpage for NEPA Requirements.

[5] BLM's National Environmental Policy Act Handbook H-1790-1 (January 2008).

with the setting of the proposed action." *Id.*[6]  To fulfill its purpose, the agency's environmental analysis must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

44.     When determining the scope of the proposed action for purposes of NEPA review, agencies must consider connected actions, which are closely related to the proposed action and either automatically trigger other actions that may require an EIS; will not proceed unless other actions are taken previously or simultaneously; or are interdependent parts of a larger action and depend on the larger action for justification. 40 C.F.R. § 1501.9(e)(1).

45.     In considering the affected environment, agencies must obtain information relevant to reasonably foreseeable significant adverse impacts. 40 C.F.R. § 1502.22.  To comply with NEPA's requirements, the agency must set an appropriate environmental baseline detailing the nature and extent of the resources in the affected area.  The effects are measured against the baseline. Absent information concerning baseline conditions, the agency cannot reasonably determine the full scope of effects.

46.     Agencies must also consider cumulative effects of past, present, and reasonably foreseeable future actions taken together with the proposed action and each alternative. NEPA Handbook at 6.8.3.

47.     The CEQ defines cumulative effects as "the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal and non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  If the cumulative effects of the proposed action and

---

[6] Under the pre-2020 regulations, an action may be "significant" if it affects unique environmental characteristics such as wetlands or ecologically critical areas, 40 C.F.R. §1508.27(3); the effects are highly controversial, 40 C.F.R. §1508.27(4), or are uncertain or involve unique or unknown risks, 40 C.F.R. §1508.27(5); the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration, 40 C.F.R. §1508.27(6); the action is related to other actions with individually insignificant but cumulatively significant impacts, 40 C.F.R. §1508.27(7); or the action may adversely affect sites listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources, 40 C.F.R. §1508.27(8).

connected action(s), when taken together, would be significant, then an EIS must be prepared. 516 DM 11, 11.8(A)(2).

48.     Connected actions cannot be segmented in order to reduce the level of NEPA review. 516 DM 1, 1.5(A)(3); NEPA Handbook at 6.5.2.

49.     Agencies are required to consider a range of reasonable alternatives that are technically and economically practical or feasible to meet the purpose and need of the proposed action, which must include all reasonable alternatives, or if there are a very large number of alternatives, at least a reasonable number that covers the full spectrum of alternatives. 40 C.F.R. § 1502.14; 46 C.F.R. § 46.240.

50.     Alternatives must be rigorously explored and objectively evaluated, 46 C.F.R. § 46.240(c), and BLM is required to include such alternatives analysis in the EA. 516 DM 11, 11.7(B)(2), (3); NEPA Handbook at 6.6.  The alternatives review is the "heart" of the NEPA process because it gives the decision-maker the basis for choice among actions.  Alternatives may be eliminated from further review and not detailed in the EA under certain circumstances, but such eliminated alternatives must be identified and the reasons for eliminating them must be briefly explained in the EA. NEPA Handbook at 6.6.3; 40 C.F.R. § 1502.14(a).

51.     Agencies may rely on mitigation measures to reduce or avoid adverse impacts, 40 C.F.R. § 1508.20, but if an agency relies on a mitigated Finding of No Significant Impact ("FONSI") to conclude that preparation of an EIS is not necessary, then such measures must be described in the NEPA decision documentation and monitoring must be provided to ensure implementation. 46 C.F.R. § 46.130; NEPA Handbook at 6.8.4, 7.1. The monitoring measures must be delineated in sufficient detail to constitute an enforceable commitment. A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA.  Agencies may not avoid gathering the information needed to assess a proposed project's environmental impact by committing to "mitigation measures" that take the form of information-gathering efforts to be taken after the project commences.  BLM is not permitted to simply to have a plan to make a plan.

52.     BLM's NEPA review must also consider all relevant regulations that affect public lands, including but not limited to FLPMA land use plans and resource management planning under

43 C.F.R. Part 1610. 516 DM 11, 11.3(B). A proposed action must be in conformance with any applicable BLM land use plan. 516 DM 11, 11.5; NEPA Handbook at 1.5.

53.    The Department is required to consult, coordinate, and cooperate with other agencies and government bodies, including tribal governments, regarding the impacts of a proposed agency action within the jurisdiction of that body or related to its interests. 40 C.F.R. § 46.155.

54.    Public involvement is a required and critical component of NEPA. Throughout the NEPA process, agencies are expected to engage in public outreach, solicit comments from interested or affected parties, meaningfully consider public comments, and address such comments where appropriate in its review of the proposed action. 40 C.F.R. § 1506.6(a); NEPA Handbook at 6.9.

55.    The Department is required to utilize consensus-based management wherever practicable in the NEPA process, which involves outreach to potentially interested or affected parties "with an assurance that their input will be given consideration" by the agency when reviewing a proposed action. 40 C.F.R. § 46.110(a). It is not enough to simply gather up comments from stakeholders.

### The Federal Land Policy and Management Act

56.    FLPMA, 43 U.S.C. § 1701 *et seq.*, gives the Secretary the authority to manage public lands and regulate the use of public lands, including the drafting and approval of land use plans and permits, licenses, and other approvals that are in conformance with such plans. 43 U.S.C. § 1732(b). FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

57.    If a proposed action is not in conformance with an applicable land use plan, then BLM must rescind the proposed action or amend the plan.

58.    BLM approved a Resource Management Plan ("RMP") in July 2004 for 1.2 million acres of public lands in northwest Nevada, which includes the Black Rock NCA and associated wilderness areas and other contiguous lands (collectively, the "Black Rock-High Rock Lands"). Portions of the Project location is in or otherwise adjacent to the Black Rock-High Rock Lands subject to this RMP, which is therefore applicable to the Project.

59.     The RMP identifies the Black Rock-High Rock Lands as a "very special piece of the American landscape" and seeks to fulfill Congress's intent to "preserve this exceptional area and by doing so to ensure that the extraordinary experiences it provides today will still be available to future generations." RMP at 1-1.

60.     Goals of the RMP include providing unique opportunities to experience emigrant migration; protecting a large part of the Northern Great Basin in its current, predominantly natural state; supporting visitor services; managing plant and animal species to support the healthy ecological system; managing wilderness areas for visitor use and enjoyment in a manner that will leave them unimpaired for future use and enjoyment as wilderness; allowing for social and economic uses that benefit local communities; providing for protection of cultural, religious, and archaeological values; and cooperating with other agencies and tribal governments to ensure consistency with these goals.

61.     The RMP specifies that one portion of the Black Rock-High Rock Lands known as the South Playa is open to new geothermal leasing, in addition to other goals and objectives relating to the preservation of cultural, historical, visual, environmental, archaeological, and water resources within the Black Rock-High Rock Lands.

62.     The RMP specifies that there are "significant cultural resources [] found throughout the planning area, including the Applegate-Lassen Emigrant Trail, designated as a national historic trail . . . . the Nobles Trail, the route of the old Western Pacific Railroad (now Union Pacific), sites associated with seven historic mining districts, military sites, and traces of an early motion picture location and past ranching activity. Prehistoric resources are also well represented, with quarrying sites, lithic scatters, rock shelters and caves, campsites, and rock art." RMP at 1-3.

63.     The RMP contains several goals and objectives relating to preservation of such cultural resources, including to "protect the setting and physical traces of emigrant trails for the benefit of current and future generations."

64.     The RMP also contains several goals and objectives relating to preservation of visual resources "to provide a primitive and natural visual setting for visitors" and "protect the visual integrity of the emigrant trail corridor." The RMP specifies that "[a]ny changes must repeat the basic

elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape."

65.     Similarly, the RMP recognizes the importance of water resources within the Black Rock-High Rock Lands, including the presence of thermal springs that "are of considerable significance in the natural and cultural history of the Black Rock Desert."

### *The Administrative Procedure Act*

66.     The APA, 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; which are in excess of statutory jurisdiction, authority, or limitation; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

### **FACTUAL ALLEGATIONS**

67.     On October 1, 2020, the BLM issued a press release initiating a 60-day NEPA pre-scoping period with the goal of soliciting early public input on Ormat's proposed project. At the time, Ormat was proposing a geothermal development project, which included two geothermal power plants and a power line. Ormat had submitted to BLM a geothermal utilization plan and plan of development for the proposed power line. The press release described the proposed development project and requested the public's input.

68.     A total of 30 comment submissions were received during the 60-day pre-scoping period, which ran from October 1, 2020, through December 1, 2020.  Many comments, including those of Plaintiffs, objected to the notion of a geothermal plant at this location.

69.     According to the January 2021 Draft Public Pre-Scoping Report, during the 60-day pre-scoping period, Ormat withdrew its utilization plan and plan of development, and submitted to the BLM an operations plan for geothermal resource confirmation project only.  Thus, after the BLM solicited public scoping comments on its full geothermal development plan and initially

received negative comments, Ormat did not abandon its plan to develop geothermal resources in Gerlach; rather, Ormat decided to apply for only the first phase of the project (confirmation of the resources through the Exploration Project).  However, the confirmation of the resources and the development of the geothermal plant and construction of power lines are connected actions with an inevitable outcome.  The geothermal resources are clearly present in the area given the abundance of geothermal springs. The purpose of the confirmation wells is merely to determine *where* to put the permanent geothermal production wells, plant, and related structures. Moreover, the future location of permanent geothermal production wells will likely be pre-determined in the confirmation phase of the Exploration Project, as the confirmatory exploration well pads can be transitioned to permanent use for permanent production wells. This amounts to unlawful segmentation of reasonably foreseeable phases of the same Project.

70.     On December 10, 2021, the Black Rock Field Office issued a News Release soliciting public comment on an Operations Plan proposed by Ormat.  The Release stated the following: "The field office is analyzing the environmental effects of the proposal to construct, operate, and maintain the Gerlach Geothermal Exploration Project in the Gerlach Geothermal Lease Unit located in Washoe County, less than one-mile northwest of Gerlach on the western edge of the Black Rock Playa. Ormat has proposed further exploration of the Gerlach geothermal resource based on results of previous geothermal exploration including the drilling and testing of geothermal wells and access road construction."

71.     On August 19, 2022, BLM released the Draft EA and eight additional supporting documents to the public. These documents include a 74-page public scoping report dated five months earlier — March, 2022 — wherein BLM lists 283 substantive comments without discussion.

72.     According to BLM, during the 30-day draft EA comment period, the BLM received 32 comment submissions, including from Friends of Black Rock/High Rock, Friends of Nevada Wilderness,[7] the Burning Man Project, and residents of Gerlach. While there were over 165

---

[7] Friends of Nevada Wilderness submitted comments during the draft EA comment period jointly with the Center for Biological Diversity, which is not a party to this Complaint.

substantive comments, BLM did not make any changes in response to comments other than those requested by Ormat.

73.     As discussed in the October 21, 2022  Decision Record, changes were made to the alternatives in Chapter 2 (moving three proposed wells), there were adjustments to the road improvements, and minor changes were made to the future monitoring plan (as outlined in the revised Table 3-11).   But, the future monitoring plan contains no discernable or enforceable mitigation measures. "If water quality or quantity effects were detected, appropriate measures to mitigate the effects, as determined by Ormat in coordination with the BLM Authorized Officer, would be implemented."  It is merely a plan to monitor and figure out how to prevent further harm after harm has already occurred. Moreover, it gives the applicant, Ormat, the authority to self-monitor for such harm with no third party oversight.

74.     The October 21, 2022  Finding Of No Significant Impact ("FONSI") concludes that: "Based on the issue-based analysis presented in the EA, no significant impacts were identified—either specific to the project or cumulatively when combined with the reasonably foreseeable future actions." While noting that interested parties have expressed concerns related to the potential impacts on nearby hydrologic resources, especially hot springs and groundwater, the FONSI concludes that "[m]itigation measures have been developed to reduce or offset potential adverse impacts and minimize overall impacts." The FONSI also concedes that the commenters "expressed concerns about potential impacts on noise, night skies, cultural resources, socioeconomics, environmental justice, and recreation."  However, such comments did not change the agency's conclusions.

75.     Moreover, the FONSI concedes that the Exploration Project is part of a larger action, consistent with the pre-scoping plans disclosed by Ormat.  "The action may establish a precedent for future actions with significant effects. This is because geothermal resource confirmation activities have been proposed to determine if the geothermal resource in the Gerlach area is viable for the development of commercial power production facilities. A Plan of Development for a transmission line right-of-way could also be expected as a future action." FONSI at 3.

*The Environmental Assessment is inadequate.*

76.     An Environmental Assessment must include (1) a description of alternatives to the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposal be implemented; and (3) any irreversible and irretrievable commitment of resources that would be involved in the proposed action should it be implemented.  The Ormat EA is legally deficient in all three areas.

77.     The proposed action considered under the EA includes construction of 19 geothermal resource confirmation wells and well pads, 2.8 miles of improved and new access roads, temporary ancillary support facilities, and applicant-committed environmental protection measures. The proposed Exploration Project area is 2,724 acres and the total surface disturbance within the Exploration Project area, after interim reclamation, would be 29.4 acres on public lands administered by the BLM.  The life of the Exploration Project is expected to be five years.

78.     Thus, Ormat made a conscious decision to prevent public comment on construction of the inevitable geothermal plant and power lines by narrowly defining the purpose and need for the action to only the initial confirmation phase of the Project.  The adoption of the purpose and need statement is one of the most consequential decisions that the lead agencies make in the NEPA process, because the purpose and need provides the foundation for determining which alternatives will be considered and for selecting the preferred alternative.  As described in the BLM's NEPA Handbook, "[i]t is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision." NEPA Handbook at 35. Even under an EA, the regulations require a "brief discussion of the need for the proposal." 40 C.F.R. § 1508.9(b). The purpose and need for the proposed action cannot be defined so narrowly as to avoid assessing a wider range of alternatives, and it cannot be defined in a manner that can only be accomplished one way.

79.     The EA defines the purpose and need as responding to Ormat's application for exploration of geothermal resources, including construction of geothermal power exploration wells and associated facilities, under the BLM's authority. EA at 1.3. This circular definition of the purpose and need does not describe how the project purpose and need affects the size, location, or

scope of the Project. In addition, this is a transparent attempt to avoid disclosing the impacts of the full scope of Ormat's entire geothermal project in Gerlach, which, based on Ormat's previously submitted plans, will include two geothermal power plants and at least one power line.  Obviously, Ormat would not be drilling up to 21 wells if they did not believe there are viable geothermal resources in the area, and clearly the 2.1 acre well pads, new access roads, and fencing were not proposed with the expectation that all of this infrastructure be removed after exploration is complete. In fact, the NEPA Decision Documents do not state that the well pads will be deconstructed and removed upon completion of resource confirmation, likely because Ormat intends to transition the same well pads into permanent geothermal wells in the second phase of the Project. Thus, the two phases of the entire Project lack independent utility. The EA must be vacated and the matter sent back to BLM to undertake a full EIS that analyzes the full scope of impacts from geothermal exploration, development, and power transmission and operation.

***The Project will have a direct impact on the resources of the Black Rock NCA.***

80.    BLM did not account for the full scope of relevant environmental effects and failed to require the necessary protections for the environmental, cultural, and recreational attributes of the Gerlach/Empire region.

81.    In 2000, the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area Act was signed in order to protect the unique and nationally important historical, cultural, paleontological, scenic, scientific, biological, educational, wildlife, riparian, wilderness, endangered species, and recreational values and resources associated with the area.  This nationally important area, the Black Rock NCA, provides essential habitat, natural and cultural resources, high value recreation protection and economic stability to the local community of Gerlach. Congress recognized that this area contains the last nationally significant, untouched segments of the historic California emigrant trails, including wagon ruts, historic inscriptions, and a wilderness landscape largely unchanged since the days of the pioneers.  Moreover, the relative absence of development in the Black Rock Desert and High Rock Canyon areas from emigrant times to the present day offers a unique opportunity to capture the terrain, sights, and conditions of the overland trails as they were experienced by the emigrants and to make available to both present and future generations of

1   Americans the opportunity of experiencing emigrant conditions in an unaltered setting. Gerlach is
2   the gateway to the Black Rock NCA, and any additional development would significantly diminish
3   the values for which Congress designated the area.

4       82.     While the Winnemucca District RMP allows for geothermal leasing, this Project is
5   incompatible with the resource values of the area where proposed.  Objective D-MR 4 (BLM 2015a,
6   p. 2-172), states, in part, that "[l]ands within the WD would be open to geothermal and oil and gas
7   leasing and development except where *incompatible with important resource values*" (emphasis
8   added).

9       83.     The Friends of Nevada Wilderness undertook a careful review of the ongoing
10  geothermal projects across Nevada and identified this Project as a high concern due to its significant
11  impacts to natural and cultural resources and the local economy of Gerlach.  Geothermal plants are
12  major developments that significantly affect the area surrounding them, and exploration cannot be
13  separated from production nor can the development and its associated impacts be ignored.  In
14  particular, wilderness areas are affected by development, noise and light.  The EA concedes that
15  wilderness areas will be impacted, but fails to recognize the significance of this impact.  Hence, a
16  complete review of all reasonably foreseeable impacts was not undertaken by BLM.

17      84.     Section 3.3.7 of the EA purports to address cumulative effects, which, based on the
18  EA, CEQ defines to include "past, present, and reasonably foreseeable future actions regardless of
19  what agency (federal and non-federal) or person undertakes such other actions (40 CFR 1508.7;
20  CEQ 1997." EA at 3-54.  Yet, BLM fails to analyze the most likely future action to occur after the
21  Proposed Action is completed, *i.e.*, development of a permanent industrial scale geothermal
22  generation plant and related distribution and transmission facilities in the Gerlach region.  Indeed,
23  even the FONSI concedes that such a plant would have significant effects.

24      85.     According to the EA, resource confirmation alone will occur at approximately 20
25  well sites for 45 days per well. In total, this is 900 days, or two and one-half years, of 24-hour seven
26  days-a-week drilling adjacent to the town of Gerlach and within the Black Rock NCA. There is
27  nothing preventing Ormat from drilling all wells at once or requiring any type of sequential order.
28  Hence, at the very minimum, the town's residents could be subjected to light, noise and pollution

and certain areas of the Black Rock NCA would lose their unique character of quiet solitude, all for an undetermined amount of time. Yet, BLM ignored comments submitted as early as the scoping period (including those submitted by a coalition of concerned groups) regarding these potential impacts of this Project on the rural economy of Gerlach and the recreational values of the Black Rock NCA.

86.     In 2021, the Nevada Legislature passed and the Governor signed Senate Bill 52 declaring that dark sky areas "serve to specifically promote, preserve, protect and enhance Nevada's dark sky resources for their intrinsic value and their ecological, astronomical, cultural and economic importance." Further, the Legislature determined that "[d]esignation of dark sky places in Nevada under the program will also attract tourists and other visitors to rural communities near Nevada's dark sky assets, thereby generating increased economic activity for surrounding communities and their small businesses."  Light pollution from both phases of this project will permanently impact the unique dark skies of this region.

87.     The EA's assessment of impacts to cultural resources and effects on the setting were based on the theory that the impacts would be temporary, and limited to the duration of the temporary operations.  Yet, even the first phase of the Project will substantially affect the viewshed of Gerlach, a gateway to the Black Rock NCA with extensive designated Wilderness, as well as the proposed Granite Banjo Wilderness Area. This area has extremely high recreation value and is one of the darkest night sky locations in the nation.  Gerlach's economy significantly benefits from the tens of thousands of visitors from around the world who travel to this region year-round to experience the solitude of the vast open spaces and undeveloped vistas present in the Black Rock Desert, as well as attend numerous events and pursue a variety of recreation experiences, including events held by Plaintiffs BMP, Friends of Black Rock/High Rock, and Friends of Nevada Wilderness.  Indeed, as noted in the EA, Gerlach is a known astrotourism destination, attracting visitors from outside the region. The potential dark sky impacts of this Project could impact the single most precious natural resource of this portion of Nevada, the deepest and darkest skies in the contiguous United States.

88.     While acknowledging the potential significant impacts caused by increased light from the Project, the EA includes some Best Management Practices, but does not commit to following or analyzing them.  The FONSI concludes that "[w]hile temporary changes in the visual and noise baseline conditions of the area would occur, these would be resolved upon completion of the exploration drilling and reclamation of the well pad." FONSI at 4.  Resolving an impact upon completion is antithetical to NEPA's goals and process. Furthermore, as discussed above, it is reasonably foreseeable that the well pads will be permanent once the Project shifts into geothermal energy production given that they are not required to be fully restored.  With the wells already in place, there will be no meaningful NEPA review of the well, plant, and transmission line need and location, and certainly no consideration of alternatives.  Ormat will have vested in those locations and BLM's hands will be tied.

***The Project will cause irreversible impacts to unique springs and associated ecosystems.***

89.     As indicated in the EA, there are numerous natural hot springs within the Project AOI, including the Great Boiling Springs, Ditch Spring, Horse (Corral) Spring, Mud Spring, and three unnamed springs. *See* EA at 3-10.  In the larger study area, there are approximately 50 mapped springs, including springs on the 360 Property owned by Plaintiff BMP.  These springs are what create the significant wetland habitat in and adjacent to the AOI, and it is their discharge levels that are most essential to maintain the value of these habitats. Wetlands in the desert are biodiversity hotspots, providing habitat for invertebrates, fish, resident and migratory birds, and a vital water source for larger terrestrial wildlife. Further analysis of the impacts on protected species and their habitats is therefore warranted.

90.     Section 2.1.4 of the EA indicates that 35,000 gallons of water per day will be needed for well drilling. Additionally, 6,000 gallons per day would be required for grading, construction, and dust control.  EA at 3-41.  Section 3.3.5 indicates that as much as 1.845 million gallons of water could be consumed per well drilled, or 6.8 acre feet.  With the EA authorizing as many as 20 wells, this yields a total water consumption potential of 36.9 million gallons or 136 acre-feet. Yet, the EA fails to adequately disclose and analyze the plan for procuring 136 acre-feet of water for drilling.

Instead, the EA offers an inadequate analysis of baseline conditions that would allow Ormat to self-monitor for potential effects.

91.     The approved plan allows each well to be drilled at depths between 1,500 and 7,000 feet and may include directional drilling to intercept geothermal targets under private property.  EA at 2-2. "During drilling, the potential exists for geothermal fluids to mix with the shallow groundwater aquifer, potentially affecting the water quality, including temperature, of spring discharges and the associated surface water features." EA at 3-141. The EA states that, in compliance with DOI's Geothermal Resources Operational Order No. 2, the well casing depth will be no less than 200 feet below ground to prevent commingling of geothermal fluids and underground aquifers.  EA at 2-2.  However, there is nothing to indicate that Ormat has sufficiently studied the unique geothermal springs and aquifer in this region to understand connectivity between them, and ensure that such a measure will actually prevent commingling.

92.     The EA concedes that spring discharge rates for other groundwater users in the area could be impacted by the Project, but the EA characterizes this impact as "temporary". According to the EA, "[i]f sourcing construction water from shallow water wells in the AOI, there is the potential to temporarily reduce spring discharge rates or lower groundwater well levels and productivity for other groundwater users in the local hydrologic basins." EA at 3-41.  However, the unique characteristics of groundwater and the geothermal springs in this area could be irreversibly impacted by the Project, and it could affect water rights for individuals such as Mr. Jamieson. There have been instances of other geothermal energy developments that have resulted in significant, irreversible harm to nearby hot springs. An underground reservoir that feeds springs on the surface could be permanently damaged when the water quantity, temperature or quality is altered. The EA further states that "wetlands that are hydrologically fed by spring discharge could be adversely affected." EA at 3-41. While the EA notes that "purchasing water from outside the local hydrographic basins and transporting it to the Project site would have no effects on spring discharge rates, wetland conditions, or water rights in the local hydrologic basins," Ormat is not required to explore this option further. Instead, the EA and FONSI permit Ormat to potentially harm the local hydrologic basin with its Project and simply monitor to identify when such harm has occurred.

Given the permanence of such harm, this approach is woefully insufficient to preventing impacts to these significant resources.

93.   Mr. Jamieson and BMP in particular have raised significant concerns, given such repeated, severe, and possibly permanent impacts to the springs caused by existing geothermal generation facilities in the western United States, that impacts are likely to occur from the resource confirmation activities and inevitable power generation activities.  The EA allows for significant withdrawals from the deeper geothermal reservoir. The Great Boiling Springs are so named because it is a thermal feature, almost certainly discharging water from the same aquifer that Ormat is proposed to tap into for this geothermal Project. The idea that significant pumping and reinjection could happen in this aquifer and *not* affect springs discharging from the same aquifer strains credulity. Indeed, there is evidence of such temperature and water level impacts to hot springs near the Dixie Meadows geothermal facility in Fallon, Nevada.

94.   The FONSI concedes that "[i]nterested parties have expressed concerns related to the potential impacts on nearby hydrologic resources, especially hot springs and groundwater."  The determination in the FONSI that the impacts are not significant is based on the notion that the impacts are temporary and can be mitigated. Yet, Ormat is not required to do anything until after the fact.  The EA fails to adequately describe any planned mitigation measures for impacts to surface and groundwater features. The draft mitigation plan prepared by Ormat's consultant is inadequate, as is conceded in the EA itself. EA at 3-41. BMP and others have pointed this out numerous times in comments to BLM, and have made specific requests for more detail and certain parameters, all of which have been ignored.

95.   For example, the monitoring plan does not detail what the response would be if monitoring detects changes to surface water features. "Within six months of the signing this Decision Record and before drilling any new wells, Ormat must prepare a final hydrologic monitoring plan in coordination with the BLM. . . . Ormat will develop a water resource monitoring plan in accordance with BLM and Nevada State regulations."  Decision Record at 25.  This is a plan to make a plan, with no enforceable mitigation measures. While the Record Decision provides that the plan meets certain minimum criteria, there are no details such as thresholds for significance,

adaptive management terms, standards to prevent and mitigate harm, monitoring procedures, and no requirement to share the results with the public.  Given the concessions made on lag time of impacts and the likely significance of impacts, the mitigation plan should have been further developed with assessable measures and subject to comment by those parties that may be impacted by Ormat's activities.

### *The proposed Project alternatives were unreasonable and lacking.*

96.     BLM did not address legitimate alternatives to the Project consistent with NEPA's requirements.  NEPA requires agencies preparing an EA to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources. 40 C.F.R. 1508.9(b). The identification and evaluation of alternative ways of meeting the purpose and need of the proposed action is the heart of NEPA analysis.

97.     The lead agency or agencies must "objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."   A Citizen's Guide to NEPA (2007) at 16, citing 40 C.F.R. § 1502.14.

98.     The EA considered three alternatives (A, B, C) and one no-action alternative (D). However, the only differences between the three action alternatives are slight deviations in access points of +/- 1 mile and proposed surface disturbance of +/- 3 acres.  The alternatives do not contemplate meaningful differences with regard to the crux of the action—the wells—by contemplating different geographic locations, layouts, sizes, or number of wells within the 2,724-acre AOI in order to address sensitive resources such as the Great Boiling Springs and the Black Rock NCA or viewshed impacts.  Rather, it seems Ormat attempted to satisfy the alternatives requirement by simply making insignificant changes to an ancillary feature (*i.e.*, access points) of the proposed action.  This is contrary to the intent of NEPA's alternatives analysis and is insufficient to satisfy the requirement for a reasonable alternatives analysis. Moreover, BLM completely ignored all public comments concerning alternative locations.

99.     The EA does not look at alternative locations owned by or otherwise accessible to Ormat with less environmental impacts.  As pointed out in comments to BLM, all other sites in

1   which Ormat has developed a geothermal plant do not include as similarly high resource values as

2   the Gerlach site. Alternative locations to avoid harm to such highly valued resources should have

3   been considered in the EA.

**FIRST CLAIM FOR RELIEF**

*BLM's Final EA, FONSI, and Decision Record Violate NEPA and the APA.*

6   100.   Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the

7   preceding paragraphs.

8   101.   BLM's compliance with NEPA is subject to judicial review under the APA. The

9   APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions

10  found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

11  law." 5 U.S.C. § 706(2)(A).

12  102.   NEPA requires that an agency's environmental analysis must "provide full and fair

13  discussion of significant environmental impacts." 40 C.F.R. § 1502.1.  Whether the agency prepares

14  an EA or an EIS, the agency must take a "hard look" at all direct, indirect, and cumulative

15  environmental impacts of the proposed action and its alternatives. 40 C.F.R. §§ 1502.14, 1502.16.

16  To fulfill its purpose, the agency's environmental analysis must "provide full and fair discussion of

17  significant environmental impacts." 40 C.F.R. § 1502.1.  In order to objectively analyze effects, the

18  agency must establish a baseline against which the effects are measured.

19  103.   Defendants have failed to adequately and accurately analyze the Project's direct,

20  indirect, and cumulative impacts to water resources, the landscape, the local economy, and other

21  aspects of the environment.  In particular, BLM has failed to adequately analyze the impacts of the

22  Project on local springs, wetlands and groundwater, as well as aesthetic impacts and changes to this

23  unique desert environment, and BLM has failed to consider cumulative effects of the inevitable

24  future plant and power transmission.

25  104.   The agency must rigorously explore and objectively evaluate reasonable alternatives

26  to the proposed action, including a baseline alternative of taking "no action." 40 C.F.R. § 1502.14.

27  The agency must "study, develop, and describe appropriate alternatives to recommend courses of

28

action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

105.    Defendants have failed to consider and analyze a range of reasonable alternatives to the proposed action, as required by NEPA and the NEPA implementing regulations applicable to the Project. Defendants' Final EA analyzed alternatives based solely on access points.  No attempt was made to look at alternative well locations or fewer wells to accomplish the Project purpose and need, including off-site locations.

106.    NEPA and its implementing regulations require federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4.  An action cannot be segmented into smaller parts in order to avoid a finding of significance.

107.    The project as originally proposed by Ormat included a geothermal plant and transmission power lines.  During the scoping period, however, BLM allowed Ormat to redefine the Project purpose and need to include only *confirmation* of geothermic resources, not ultimate production of those resources. However, geothermal development inevitably follows resource confirmation. These are connected actions.  The FONSI makes clear that permitting the Exploration Project may establish a precedent for future actions with significant effects given the inevitable development of commercial power production facilities and a transmission line right-of-way. Ormat is confirming where geothermal resources are located within this region for the purpose of developing a geothermal plant. Indeed, Ormat is not required to decommission or remove the wells that it installs during resource confirmation; and it follows that these confirmation well pads will be transitioned into permanent wells during the inevitable development of a geothermal plant following resource confirmation.

108.    Thus, Defendants have illegally segmented this Project and failed to consider the entirety of Ormat's reasonably foreseeable plans, *i.e.*, resource confirmation *and* geothermal plant development and operation.

109.    BLM's NEPA review must also consider all relevant regulations that affect public lands, including but not limited to FLPMA land use plans and resource management planning under 43 C.F.R. Part 1610.

110.    The impacts from the Project are inconsistent with the Black Rock NCA's RMP and will result in degradation of the Black Rock NCA and other wilderness areas.

111.    NEPA and its implementing regulations require federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4. Where an agency attempts to avoid the EIS requirement by relying on mitigation measures, its discussion of the proposed mitigation measures must be carefully considered, based on scientific studies, and effective to avoid significant impacts.

112.    BLM failed to adequately and accurately define or analyze necessary mitigation measures, and the effectiveness of those measures, as required by NEPA and the NEPA implementing regulations.  The EA requires that, within six months of the signing the Decision Record and before drilling any new wells, Ormat must prepare a final hydrologic monitoring plan in coordination with the BLM.  This deferred mitigation plan lacks sufficient details such as justifying the monitoring locations, describing what the response would be if monitoring detects changes to surface water features, and has no criteria for approval or thresholds for determining significance.

113.    For all of these reasons, BLM's actions and omissions regarding the Project violate NEPA and are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## SECOND CLAIM FOR RELIEF

### *BLM's NEPA Documents and Approval of the Operations Plan Violate FLPMA.*

114.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

115.    FLPMA is intended to ensure that all federal public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological,

environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).  FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

116.    FLPMA requires that the public lands be managed "in accordance with" land use plans. 43 U.S.C. § 1732(a). "All . . . resource management authorizations and actions" must "conform to the approved plan." 43 C.F.R. § 1610.5-3(a). If a proposed action is not consistent with the applicable land use plan, BLM must rescind the proposed action or amend the plan. 43 C.F.R. §§ 1610.5-3, 1610.5-5.

117.    To ensure conservation protection of the unique and nationally important features for future generations, in 2000 Congress created the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area.  The Act states that the "Secretary shall only allow such uses of the conservation area as the Secretary finds will further the purposes for which the conservation area is established." This requires adoption of a comprehensive resource management plan for the long-term protection and management of the conservation area.

118.    BLM's approval of the Project is inconsistent with the BLM Winnemucca District Resource Management Plan because it is incompatible with important resource values.  BLM's approval is inconsistent with the agency's responsibility to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

/ / /

/ / /

/ / /

/ / /

/ / /

30

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that BLM violated the law as described in this Complaint;

2.    Vacate and set aside the EA, FONSI and Decision Record;

3.    Enjoin BLM from authorizing or otherwise allowing Ormat to undertake any activities within the leasing area at issue;

4.    Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs;

5.    Grant Plaintiffs such additional relief as the Court may deem proper; and

6.    Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein.

Respectfully submitted this 9th day of January 2023.

   */s/ Chris Mixson*
Christopher Mixson (NV Bar #10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Rafe Petersen (D.C. Bar #465542) (*pro hac vice to be requested*)
Alexandra E. Ward (D.C. Bar #1687003) (*pro hac vice to be requested*)
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, DC  20006
Telephone: 202.419.2481
Fax: 202.955.5564
rafe.petersen@hklaw.com
alexandra.ward@hklaw.com

*Attorneys for Plaintiffs*